Case No. 23-1347, Food Marketplace, Inc. et al. Petitioners v. Environmental Protection Agency and Michael S. Reagan in his official capacity as Administrator, United States Environmental Protection Agency. Mr. Lin for the petitioners, Mr. Martin for the respondents. Good morning, counsel. Mr. Lin, please proceed when you're ready. Good morning, Mr. Chief Judge, and may it please the Court. I'm Robert Lin on behalf of the Petitioner Food Industry Associations, and if I may, I'd like to reserve three minutes for rebuttal. The associations fully support the policies behind the AIM Act, and there is much in the rule that we do not challenge. But the aggressive deadlines EPA has set for the refrigeration and HVAC sectors make compliance virtually impossible, which is a reflection of the fact that several key premises are legally wrong or unexplained. I'd like to focus on three this morning. The first is that EPA's interpretation of the term availability is inconsistent with the plain meaning of that word. Rather than ready to use, EPA's interpretation is more like maybe possibly ready. EPA now says it agrees with that definition, but that's not what it said in the rule. The second error is a failure to explain under the Supreme Court's recent Ohio versus EPA decision. Just as in Ohio, EPA here promulgated a rule premised on certain assumptions being true. In Ohio, it was the number and identity of states. Here, it is the number of and identity of substitutes. Ohio holds that even accepting those assumptions and predictions are adequately explained. An agency must anticipate and address what would happen in the event that certain of those assumptions don't pan out in reality. EPA did not do so in Ohio, and it did not do so here. And finally, our third issue is that if you actually dig into them, some of EPA's predictions in every subsector are underexplained. And that is an independent problem that undermines the rule under the Maryland-D.C.-Delaware Broadcasters case. Let's start with your legal point. Yes, Your Honor. I'm just very puzzled at what the dispute actually is at this point. I can imagine a focused legal argument about whether availability is assessed at the time of compliance or at some earlier point that gives you lead time. I can imagine a focused legal dispute about whether all or some of the subfactors must be satisfied. You gave up both those arguments. You affirmatively gave up both of those in your reply brief. You invoke a dictionary definition of plain meaning, which EPA doesn't really contest. So what are we fighting about at this point on the interpretive question? Of course, Your Honor. So two answers. I thought you're going in a different direction. Let me start with where I think you ended, which is that EPA doesn't contest that the plain meaning is ready to use. I think the problem for them is that that's not what they said in the rule. They said in the rule that… Present and ready for immediate use at the compliance date. Correct. Okay. Yes. And that's not what they said in the rule. What they said in the rule is that they understood availability based on… They considered substitutes available based on the expectation that many of the subfactors could feasibly be met. We don't think that that's the same thing as ready to use. Your Honor, I think you will search in vain in the rule for the phrase ready to use or, Judge Katsas, as you said, immediately available, immediately obtainable at the time of compliance. They don't say that. So you're fussing over the wiggle room introduced by the word expects, the word many, and the word feasibly. Could feasibly. Could feasibly. Could I give you an example as to why? Here's why I think it matters. I think it's one thing if I were to predict, Your Honor, because the definition of availability is what they're making their predictions against, right? So if I were to say, Your Honor, I think you will win this race against this Olympic champion, there's a certain number of things that you would expect me to say to justify that. I think it would be actually perhaps impossible for me to rationally justify it. But if I said you could feasibly win this race against an Olympic champion or you may possibly win this race, there's a lot of other explanations that I could provide, including that I think it's possible that the Olympic champion would trip and fall. And you would finish first. That's why the distinction matters. Ready for use at the time of compliance requires more explanation or qualitatively different kind of explanation than does what they said in the rule. So expects just to my ear, expects just connotes the truism that if the relevant time for assessing this is the effective date of the rule, by definition, they're making a predictive judgment. Of course, Your Honor. You can't observe a fact about the world. Correct. Prediction is expectation. Correct. Yes, we are not. We're not taking issue with the word. All right. Many, many sub factors is just the question I pointed out earlier that you affirmatively gave up. You could fight over whether some of the sub factors are necessary elements. You've given that up. So the many doesn't really help you. So we're just fighting over gradations connoted by the word feasibly. And the word could. Could feasibly. I think could feasibly, again, encapsulates an indeterminacy that is very different from will be ready for use at the time of compliance. And again, I think hopefully my example was helpful to you. We can come up with other ones if we would like. But I think there is a difference between predicting that something with certainty. And I think ready for use encapsulates 100% or something very close to 100% certainty again. Right. That's not saying that a prediction will necessarily come true. And that raises an Ohio versus EPA problem. But the issue here is that the backdrop against which they're making their predictions, which then sets the how you do the arbitrary and capricious review. Right. What you expect of them to say is fundamentally wrong. And I think there's a material difference there. So that's the first point is the word availability. And I think it is particularly telling your honor that my friend in his brief doesn't even attempt to defend could feasibly be met. He doesn't cite it. He doesn't talk about it. He doesn't try to distinguish it. He just says, I agree that ready for use is the meaning. And so I think on that ground, because that affects everything else that follows, this court could could vacate the deadlines that we have. Can I just ask you that there's a strict preservation requirement in the statute for this question? Was that put before the agency? Your honor, we this specific argument was not raised. I want to be candid with you about that. But I do think for two reasons. One, I think under the Appalachian power case that the Supreme Court just talked favorably about in Ohio, the agency did did was aware of this issue and did address it. Talks about it's been several paragraphs defending it. But I think perhaps more importantly, this issue falls squarely within this court's key assumption doctrine. An AFM case that we set in our reply brief says statutory interpretation questions that go to the foundational existence of the rule or pertain to the analytical methodology. I think are part of the agency's affirmative obligation to undertake non-arbitrary and non-capricious rulemaking. And I think both of those factors apply here. As to the delta between what they talked about in the proposed rule and what you think the deficiency is, you think that's a foundational assumption? I think the meaning of availability, your honor, is a statutory interpretation that is foundational to the rule. I think the meaning of availability is a question that pertains to the analytical methodology for the very reasons that we just discussed, which is that it guides and controls what evidence and what rational connection they need to articulate. I think both of those reasons apply here. Do you think any dispute about the meaning of a substantive term fall within this fundamental assumptions doctrine? I think this court has held that that's not the case. Right, because otherwise you would say that no statutory claim can be forfeited. Correct, your honor. And there is a case. So then we're just trying to assess, you know, like a junior varsity major questions question. Is this statutory dispute sufficiently important foundational basic or is it something more on the margins? No, your honor. I don't think it's I don't think it's sort of like a squishy sliding scale because I think the AFPM case is trying to articulate categories of statutory interpretation questions, things that go to the core statutory authority. As opposed to the example in the AFPM case was there was a statutory interpretation question about the meaning of the Regulatory Flexibility Act. And the court says that that I think it was the AFPM case. I apologize about that wrong. But they say that that that's not a statutory interpretation question that goes to the agency's authority to act. So I think the case is trying to create some categories. One of them is that. The other is, again, statutory interpretation questions that pertain to the analytical methodology. Again, I don't think that that's a you know, I mean, my reaction, as you can probably guess from my questions, is doing a great job trying to. Crystallize a legal question, but, you know, it's gradations of could feasibly versus will be doesn't strike me as the most. Foundation, I understand, Your Honor, we think that it does, we think that it goes right to the core of how they do the analysis here, which I think falls within one of the categories of AFPM. But if I could, I'd move on to the second point. Can I just give one clarification on this first one and then we'll go on to the second one. So I take it that in response to the questions that we both asked, Judge Kass and I have asked, your view is that availability is a foundational question. The fact that the remaining dispute is might be a fairly narrow one about what was wrong with what the agency did versus what you think they should have done. The narrowness of that doesn't matter for purposes of key assumptions, because the key assumption is just availability, period. And then once you're in the availability realm and it doesn't matter how narrow the dispute is, it's still a key assumption. That's is that the way you're. Yeah. Yes. Your Honor, I think that that's logically makes sense. I mean, for example, I think if you had a statute that gave EPA the authority to regulate greenhouse gases. And there's a dispute over what the meaning of the phrase greenhouse gases is that the key assumption doctrine applies because that's a question of statutory interpretation. That that is about a word that is at the foundation of the agency's authority to act. That dispute may be narrow. What the substance of the dispute is, I think, is different from whether the question of statutory interpretation is foundation. The second issue that I'd like to highlight is I think there is a failure to explain under Ohio versus EPA. And as I previewed at the outset, as this court knows, in that case, the Supreme Court said in granting the stay that EPA failed to address an important part of the problem where it built a rule on certain assumptions. Sorry, you're transitioning to the second. Yes. Three. That's right. Maybe I misheard you. Did you have a second reason why we might excuse any forfeiture or you're just you're resting on the key assumption? Oh, the second reason. Well, I think I said the Appalachian power case of this court says that the purpose of three or seventy seven is to ensure that the agency has had an opportunity to express, you know, apply its expertise. And we think that it did so here. And if you look at the rule, it addresses this question. I don't have versus EPA again. The court said that when an agency builds a rule on certain presumptions and there was the presence and identity of twenty three states that they has to anticipate and explain what happens if something falls away. Again, not if necessarily if in fact, although that ends up ended up being true there. The question is, as you look forward, you have to figure out you have to explain what do you what do you do if one of these assumptions doesn't play out to be true? And here the the assumptions and the predicates are for the various subsectors, the availability of a certain number of substitutes, six for some, eleven for others, ten for for for some of the other ones. There is no explanation here as to what happens if one of those substitutes falls away. So there's a logical upshot of that view. So suppose there's twenty five substitutes and twenty four of them cover ninety nine of the situations and one of them just covers one. And if just that one has a kink in it, has a chink in it, then. Unless the agency spells out that if that one, even if that one goes away, we still reach the same conclusion they've got to start over. That's an explanation, your honor, that they could have provided in the rule. I think that's what Ohio stands for. If you look at the Ohio case, what Justice Gorsuch says there is perhaps there is some explanation why the number and identity of participating states does not affect the ultimate conclusion. That that's our point here is that perhaps your honor, the twenty five doesn't matter. And perhaps it's because twenty twenty four of them are cover a lot of it. Perhaps the number doesn't matter at all. Right. Which is what the dispute was between the majority and the dissent in Ohio that we didn't really mean this number to be foundational or important. Right. But again, as Justice Gorsuch says there, that's an explanation that the agency could have and should have provided in the rule, but it didn't. And that is a failure to address an important aspect of the Ohio turned on the fact that the agency's own explanation. They're. Assume that I may get the fact wrong, but they said all twenty three upwind states will do such and such, and the court found that wasn't justified. I see my time has expired, but it seems very different. Yeah. Well, I don't I don't think so, your honor, because I think there I think that's what justice you could tell. That's that's a core part of the court viewed that as an essential element of the explanation. I think we're I think we're sort of on the same page, but I'll have let me start there and then move to the application of it to this case. I think what the court in Ohio said is we think, but we're not sure. And I think that's an important piece of it. I think the court said, we think, but we're not sure that what you've built here is a is a Jenga tower. And you haven't explained what happens if some of those pieces get pulled out. Maybe they will be. Maybe they won't be. But then in addressing it to make very clear, I think that we think, but we're not sure in addressing a justice for its dissent. There's a whole discussion there about is it, in fact, a Jenga tower, which I think goes a little bit to your question of the how we understand Ohio. I think the court says, look, the dissent says it's not a Jenga tower. It's something else. Right. It's not built on these 23. And Justice Gorsuch says maybe. Right. But we're not sure. We think it is. There's there's signs in the rule that suggest that this is a Jenga tower. And you have to explain either one. What happens if you pull some of those pieces out or two is you can you can quarrel with whether it's a Jenga tower at all. So that brings us to our case. I don't think it's just about, you know, do they use one substitute or another? I think I mean, the agency says in a number of places that a variety of substitutes is important, right? More than one that we identified multiple substitutes to ensure a smooth transition. That's in the rule. And so I think the fact that they have six or 11 is important. And I think, Your Honor, if you look at the Maryland, D.C., Delaware broadcasters case where Judge Ginsburg wrote the majority there, and he said that that one was about where there are two compliance options for FCC and one of them was unconstitutional. And what he says there is presumably which are sort of related, which both are pressuring the broadcasting companies to do something unconstitutional. It just seems very different. But again, Your Honor, I think that's a that's something that the agency could have said. I think that that's what Ohio was saying. They can provide an explanation for why the six is not an important. If they have if they have 12 substitutes as possibilities that they have to go through and explain every single permutation, like if if number seven is out, but one through six and eight through 12 are in, we'd still do this. If seven and two are out, three's a maybe five's a probably an eight's a very likely, but not sure. Here's the result. Do they actually have to go through every single permutation? Your Honor, I think that's the same question that one could ask of what the Supreme Court was expecting of EPA and Ohio, which is, do they have to go through every permutation of 23 states? Ohio, you said we think, but we're not sure it's a Jenga tower. Suppose that the assumption is the opposite, that we're pretty sure. But they didn't explicitly say it, but we're pretty sure it's not a Jenga tower. Is it still that point still vacate and send it back for the agency to say, no, you actually your assumption was right. It's not a Jenga. Your Honor, I think and I think what Ohio reflects there is that there's some play in the joints there. I would say that if you're in that middle where you say we think, but we're not sure we think it's not, but we're not sure it isn't. I think they still have to provide the explanation. If your honor, if you look at the rule, you disagree with us and you say this is absolutely not a Jenga tower. Well, then we've got it. We've got a different case. But I think that there's a lot of language in the rule where EPA says, you know, this is in the technical support document. We accounted for the fact that not every substitute could be used in every application. But, you know, by allowing a range of substitutes, the fact that there are multiple substitutes is critical to the deadlines that they picked. And, you know, more importantly, and your I realize in Maryland, Delaware, D.C., D.C., Delaware, there were only two. But I think there's something to be said for the fact that, you know, for some they said 11, for some they said 12, for some they said six. Why that number? And the burden is on EPA to explain that. Let me give you a couple of conceptual reasons why I'm resistant to your maximum, at least aggressive reading of those two cases. One is the APA rule of prejudicial error. It's your burden to show that any mistake in reasoning made a difference, could have made a difference. It's not a harmless error. It's not like you show error and then they have to prove harmlessness. It's not Chapman or something. First point. Second point, there's kind of a loose analogy to severability here. I don't think this is really severability because the options are support document rather than the codified text. But if you think about it that way, the presumption is in favor of severability. If we can just excise one of the options and the rest of the scheme doesn't just collapse, the presumption is that we do that. So you're saying, you know, unless they it's their burden to show. It's their burden to show severability rather than your burden to show inseparability. And both of those ideas leads me to think. You know, as long as most of as long as some number of these options. Remain, it's not good enough for you to just knock out one or two here, here or there. If I could take those those in turn, and then I think there was a third one there about what if we actually do show that some of them are out. So on the first question of of the APA. Doctrine for prejudicial error. I think Ohio actually speaks to that. Your Honor, at the very end of that opinion, where Justice Gorsuch is sparring with dissent. He says that the dissent says this, this might be this might be harmless error. And he says, one, they didn't raise it, which is the same here. That harmless error argument has not been raised. And the second is where this under the Clean Air Act, 307 D9. He says there might actually be, he says, the prejudicial error language in the Clean Air Act, which is slightly different from the APA is in 307 D8. Which talks about procedural determinations and not in 307 D9, which sets forth arbitrary and capricious and exceeds statutory authority. It sort of mirrors the standards. So that's answer one. I think Ohio. Yes. The very last before I think before the before the star. The second to your severability point. Again, I think Maryland's D.C., Delaware answers that. I mean, that's that is a severability case. And it says that if they haven't provided that explanation. And there's been a lot of skepticism recently by the Supreme Court and other courts about severability clauses that just from the EPA that just sort of say, well, we all of this stuff is severable. It can stand alone if you find an error. And I think that case, I don't think it's a maximalist reading of it. The third question that you had asked is about whether some of these way over my time, I understand. But if if some of these fall away, you know what what happens to the rule? And I just want to say, I mean, that gets into the third point that I wanted to raise, which is so there's availability. There's Ohio, which assumes that the predictions are adequately explained. But then there's the third piece of this, which is we actually don't think some of the predictions are adequately explained. And I don't want to abuse the court's privilege here, but the main complaint that we have is with our analysis of building codes and particularly with respect to local building codes. They have some answers to statewide building codes, which we don't think are sufficient. But for local building codes, the really the only thing that they say is there are 20, 30 states. That number we had trouble finding in the record. But they say there are 30 states in which SNAP approved substitutes must be allowed by local local building codes. They provide no answer to the other 20 other than the hope and the prayer that those local ones are going to come around. And I know they say and we don't contest that they don't have to go locality by locality and show every single one. But the localities in 20 out of 50 states is a lot. And I think that the arbitrary and capricious standard requires the fact that they have to provide a rational connection, requires them to do something to say something about what's going to happen. You know, you don't dispute they can construe availability to mean generally available. I don't I think that's consistent with the idea that we don't have to go through every locality. I don't know the map. The map that they cite seems to show that we're somewhere north of 40 states that have have approved or will have approved at least the A2L at the state level in light of in light of the double whammy of the SNAP approval and the IBC. Like, they're pretty powerful. But I think those are I think it's important to distinguish there. I mean, that that map is only talking about statewide legislation. It's not telling you which states have statewide legislation that preempts local laws. And that for us is the really big problem here is that they have some answers at the statewide level. And again, I don't think that they explain why the two additional years or the one additional year actually makes any more sense than four or five. But for the localities, that map has no it doesn't answer that. That's not talking about states where you have statewide laws, state law that preempts localities from doing something different. Sorry, I thought they're showing like the light blue states say building code legislation signed into law.  Assume that means that the state has said it does not be permissible to use an A2L refrigerant. That is not what it means. It does. It stops it as the state's standard. But they admit that because of home rule, the localities can do something different. Can impose a higher standard. Correct. That is absolutely true. That's in the rule. And they admit it. They say that in many of these states, many states, this is J39, 73. I have an extra number here. I think it's 143. Many states allow local governments to set their own building codes provided they comply with the minimum standards established. Minimum standards of safety, right? So they don't have to. That map doesn't address. Unless there's preemption. Unless there's preemption. Which can happen. And they say that there's 30 states. Again, I don't know where that is in the record. It's not in that map. They cite to a blog, I think, a blog post that I pulled up. Doesn't have the number 30 in there. But let's take the 30. They don't explain what you do in the other 20. They don't say, well, we think localities generally come around at a clip of 75%. So it's going to be fine. There's no explanation for the other 20. Your Honor, that map has a lot of different colors on it. But it doesn't address the local home rule problem. And with that, Your Honor, thank you for the additional time. We have a little time for rebuttal. Mr. Martin. Morning, Your Honors. May it please the Court. Daniel Martin for the United States. With me on the brief in a council table today is Ketra Ting from the Environmental Protection Agency. So, Your Honors, after hearing the presentation from my friend on the other side, I want to begin today by focusing on where petitioners agree with EPA. They agree that Congress instructed EPA to promulgate technology transitions rules by, in the words of the statute, factoring in, to the extent practicable, the availability of substitutes based on best available data. They agree that the sale only concerns prospective application, meaning sale or installation of equipment, new equipment, building new supermarkets in the future. There's no retrofit requirement. There's no you have to go tear out your old HFC using systems and put in these new systems. And they agree that because these compliance deadlines all take place years in the future, that we're inherently talking about a predictive judgment about whether a substitute will be ready for use in the future based on EPA's professional judgment and the factors that Congress set forth. So, with that agreement in mind, we're really dealing with a narrow question today for just these five specific subsectors. These are all severable from each other. Both petitioners say that EPA said that in the rule. They're all supported by separate analysis. For just these five specific subsectors, are these compliance deadlines reasonable? And the number thing I want to convey to the court today is that's an arbitrary and capricious question, not a statutory interpretation question, because we're in a situation where Congress says, here is what we want you to do. Here are the factors that we want you to look at. Again, factor in to the extent practicable. So, go do fact finding, go examine these factors, apply the best available data, your professional judgment, and reach a reasoned conclusion. And that is arbitrary and capricious review. So, another way you might ask this question, starting with where Judge Katchis started off the discussion today, is if you accepted all of EPA's fact finding, all of their reasoned decision making, all of their weighing of the factors, and you just took the different language in the preamble about does expect will happen rather than could feasibly, how would this rule look any different? And the answer is it wouldn't at all, because there's no dispute about what available means. So, starting from that point, I want to focus my time today on the three most important reasons that the court should deny the petitions. First is looking at EPA's overall approach. EPA correctly applied the AIM Act when it looked at availability of substitutes based on a holistic review of all the sub factors. But the building code sub factor seems different in kind. Talking about affordability, cost, efficiency, all of these other factors are questions of degree in which you make a judgment about, you know, at what point does the increase in cost shade into the more expensive option being unavailable. The building code is fundamentally different. It's an on-off switch, and there's no plausible meaning of availability that would apply to something that's legally prohibited. If something is legally prohibited, it can't possibly be available. That's correct, Your Honor, in the abstract. Certainly, if something is legally prohibited, it's not available. And EPA, in the rule, found certain substitutes wouldn't be available because they are legally prohibited. But the important thing is forecasting into the future, are they going to be legally prohibited? Right. So, what's your answer? Arbitrary and capricious. So, you get your opponents running a little bit uphill, but you still have to explain the timeline. That's correct, Your Honor. EPA did explain the timeline. The rule as to HVAC gave a 15-month lead time, give or take, right? That's not quite correct, Your Honor. So, it's… All right. It's passed in late December 2023, and the effective date, at least for manufacturing and import for HVAC, is beginning of 2025. Right. So, that's for manufacturing, 2025, and installation is 2026. Okay. So, I'm not sure which is the more relevant deadline for the industry, but a little over a year, a little over two years, something like that. That's correct, Your Honor. Your own discussion of building codes shows that the states and localities, there's a lag time from when some code is passed and when the legislature updates the code. That's correct. And it's three to six years. It can be up to eight years. You have a 2023 technical support document that talks about some jurisdictions still following the 2015 codes. That's an eight-year lag. Yes, Your Honor. That seems like a pretty big disconnect between what you anticipate are the lead times to get the codes changed and what you allowed the manufacturers in your rule. So, Your Honor, I want to have two responses to that, focusing on availability writ large nationwide, including the experience of the ozone-depleting substances phase-out, and then specifically what's going on the ground in these localities that might be using longer jurisdictions. So, first, on what available for building code means, the AIM Act was not passed in a vacuum. The AIM Act comes on the experience of the Montreal Protocol and phasing out ozone-depleting substances. And this exact same process happened there, where building codes originally wouldn't allow you to switch over to HFCs. And it was a gradual process where building codes start out with international building codes. They start out with the UL standards, and they start out with SNAP approval. Once those things happen, it cascades down. And the reason for that is that industry is pressuring the localities to update their building codes because they want to install their product. So EPA is drawing on that experience. Congress also entrusted them to do that. And they found that when there is regulation—and again, the HVAC sector writ large broadly supports the HVAC requirement because they want everyone to move together. They don't want imports to undercut their ability to sell the updated products. So when you have regulation that allows everyone to move together with one smooth compliance deadline, that is pressuring local building codes to update. And again, no retrofit, no tear old things out. We're talking about prospective. You want to build something new. So that's writ large. When something starts out available in some places, it becomes available in more places over time. And the lag time is not always the full eight years. Certainly nationwide, we're looking at at least 41 states at the time of the final rule that allowed A2Ls. Which I had thought pretty much cinched things up for you, but what do you do with Mr. Lynn's point that that's just the statewide floor and they have to deal with Lord knows how many hundreds or thousands of local jurisdictions? So there's a mixture of the statewide codes, and then there's also local preemption. And again, we're talking about to the extent practicable. EPA said they can see it would be totally impractical for EPA to look at every single locality throughout the country. So we're talking about generally available, and there's no evidence in the record. There's certainly no evidence in the comments that they provided during the comment period saying all of these localities and all of these states are going to not have these building codes updated. The vast majority of building codes have all been updated, and this isn't in the record because it happened after the fact, but just to satisfy the court's curiosity, we're down to just four states, and they're all expected to update by 2025. So, what we're telling you do, sorry. Just at the state level, the map looks pretty good for you, but. Now, there are 3. 3 states coded as legislative effort failed. So, yeah, thank you for that question. You're on what happens in Nevada and Kentucky and Hawaii. So, the legislative effort failed just was talking about the snap approval preemption process. We detail in our brief where we need to approve something for snap. It automatically becomes available throughout the whole state. Nevada doesn't have any state building codes. They just have county level building codes. So there was a law passed, or there's a lot tried to get past saying snap approval will apply statewide. And that failed, but they're still in the process of updating their building codes in the counties to allow a 2 wells. So it's, it goes way too far to say. You know, legislative effort failed means this isn't going to happen, but the record doesn't support that. And what's actually happening on the ground doesn't support that. Then my 2nd question about, or my 2nd point about availability is it's a completely unreasonable interpretation of the statute. And what did here to say that has to go locality by locality through all 50 states and check off a box saying now in 2023 available available available available available available available available. That's not what the statute says you have to do. No, I, I, I agree with that. But available. Seems to suggest some congruence between the time in the ordinary course that it would take on average, let's say, to do the updating and the time that you give them. I mean, you know, I suppose you could say, well, if EPA imposes a rule. Under which states can't have grocery stores, unless they change the code, probably they'll change the code, but. It doesn't seem like that describes a scenario under which the new standard is available. Well, again, new grocery stores, your honor going forward and EPA did say we have experience from the ozone depleting substances phase out. We saw that it takes a certain amount of time for these codes to be updated. And we expect that to happen here. And so far, EPA's predictions have been correct. Can I just ask you on the, on the point about general availability? So, if it was just true that five states don't allow it all, even make them low population states, five states don't allow it all. And there's no, there's no particular reason to think that they will turn around and allow it for whatever reason. But then 45 states do is availability satisfied. Yes, your honor, because it's generally available, even if it's, there's no reason to think that in a 10th of the states, there's gonna be a turnaround. Yes, your honor in that hypothetical scenario, it still would be generally available. But the important premise of EPA's analysis here is slightly different than your hypothetical, which is that when all the other states have it available and adopt it, that does pressure. Those are yeah, there's a hydraulic incentive. Exactly. Okay, so that that's extremely important interpretive. But the way you interpret the statute is that it's just generally available, meaning available in a mind run of situations. But even if there's a non trivial share of situations in which it's unavailable, and there's no prospect of availability, it's still generally available. That's correct. Your honor. But again, going to the facts here, that's why there's a range of substitutes. We're not just talking about a two else. We're also talking about carbon dioxide. We're talking about hydrocarbon. So, can I ask judge catchphrase HVACs and just on that particular example? So, the amicus brief says that there's no standing as to HVACs in particular, because if you look at the affidavit, it's really focused. The main effort is really focusing about refrigerators. Do you have a view on that? So, the United States is not contesting standing for just the challenged subsectors here. Certainly, the declaration could not provide standing. It just says we're going to be harmed by this rule. That's enough. But the Anderson declaration does say we're going to incur costs. And that aligns with EPA's analysis that there'll be some startup costs, but eventually, including with HVACs, but eventually there'll be handsome savings from the increased efficiency over time. I mean, all of these new systems are way more efficient than the HFC systems. And that's why, in addition to positive environmental impacts, we're seeing positive cost impacts, especially for small businesses and residences. It does seem the case that they would only be able to challenge standing as far as it affects the food retail industry. But the way the rule is written is just for HVAC writ large. And so, assuming you wanted to go down the road of saying just for HVAC, we don't think that that was adequately explained. The remedy would really be remand, and then EPA could craft a more narrow rule. Certainly, remand without vacater, because it's going to be so disruptive to the HVAC industry, which broadly supports this rule to allow imports from other countries to come in and undercut the new products. So, for HVACs in particular, we're not contesting standing, but I think a narrow remedy would be the most appropriate thing there. So, one additional point I want to make about the overall approach that EPA said, we had a lot of discussion about severability and what does it mean to knock out something in a Jenga tower? This is not a Jenga tower. This is nowhere close to Ohio. This is nowhere close to Maryland, D.C., Delaware. Because there, you're talking about actual compliance options. FCC, you have two options. You can follow this regulation or you can follow this regulation. EPA does not care at all what substitutes the industry decides to use. The market is going to decide what's best for all these different applications. Instead, it's about, is there enough time for the alternatives to come into play and be available? And so, once you have that understanding of how the rule works, and this is what Congress said they wanted the rule to look like, then this is how the case makes sense. And EPA, I really want to push strongly against this idea that EPA didn't explain this. It is baked into the rule that you have compliance deadlines into the future so that multiple substitutes can come onto the market. And no guarantee that the substitutes EPA identified will all 100% be available. EPA said this, you can look at the JA 3453, where it talks about, there are some substitutes that have constrained availability. Where are you? JA 34. Yeah, I'm on 34. Yeah. Where are you on 34? I don't have the exact quote in front of me, Your Honor, but if you look, I remember from my prep, I think it was in the bottom left side of the three columns. When you look at the rule, some substitutes might have constrained availability, and that's why we have increased some of these compliance deadlines so that everything can come onto the market. That's the whole premise of this rule, is we set reasonable compliance deadlines. Industry determines what innovation will happen, and then the market decides what these substitutes are. And they might be different for different subsectors, different applications. But at the very minimum, I see I'm out of time, Your Honor. At the very minimum, I just want to conclude by saying that for many of these subsectors, I'm talking about standalone units, cold storage, warehouses in particular, the substitutes are already on the market. The transition has already happened. And so vacating those subsectors where there's already widespread availability, it flies in the face of the data, what EPA did here. There are no further questions. The court should admit it. Which one did you say is ready? The cold storage? So to be clear, there's an available substitute right now in all five subsectors. But in standalone units, cold storage, warehouses in particular, the substitutes are already dominant on the market, as opposed to something like supermarkets where carbon dioxide is broadly used, Europe, Japan, United States, but it's not dominant in the market yet. Thank you. Thank you. We'll give you the three minutes that you requested. Thank you, Your Honor. Just a couple points. I want to start with a focus on HVAC. I think it's really important to understand there that there are only two categories of substitutes, A3s and A2Ls. A2Ls have the building code issue, which I'll address a little bit more. A3s, EPA says themselves that they are only available for window units and portable air conditioners. That is not what we use in giant grocery stores. So if you take the A2Ls out, I just don't think you've got available substitutes for A2Ls. On the building codes point, my friend gave a long explanation of their experience with the transition from ODS, and he said we saw that the timeline worked. One, that discussion is not in the building codes analysis, in the TSD, or in the rule. And two, my friend didn't give you years. He didn't say, well, it was two years there, and it should be two years here. And do we know that the state numbers are the same? Do we know that the number of localities is the same? I think you can just point to the ODS transition and say, well, it worked there. It worked here. That's the explanation that's missing. Similarly. What's wrong with the assertion that it seems that these new standards have been generally approved? Maybe it's 40. Maybe it's 30. A lot of approval. A lot of reason to think there will be approval. It seems like jurisdictions respect SNAP and respect the International Code. And their catalyst theory, which is this really holds the state or municipal legislators' feet to the fire. Like, they're going to get this done because it's important. Of course, Your Honor. Their towns won't have grocery stores otherwise. I think one way to think about it is to look at the fact that for some of these particularly supermarket systems, there was a change in the deadlines after the notice and comment period. So EPA recognized after the notice and comment period that one year wasn't enough because of some of the building code stuff. And they had before them this sort of general notion. But then they were like, oh, okay, one is definitely not enough, so we'll just add two more. We think two more is enough. Well, why? Right? That's the rational explanation that is missing. And, yes, it sort of seems like some of these things are working, but how do you connect that to the timeline? And that's all we're talking about here is not the transition itself, but the timeline. They haven't explained that. And on the local building codes, I think Nevada is a really great example. I mean, my friend said there's no statewide building code, and the localities all do their own stuff. And they tried to preempt it, and it didn't pass. What's going to happen in Nevada? Right? And there's no explanation, even based on experience, as to why this will continue and get any better. Sorry. I had one last point, if I could make it. Just on the meaning of availability, we had a discussion about whether they agreed to ready to use at the time or if it's something, I think, significantly more squishy than that. One of the last things my friend said is, we said, we think that some of these substitutes aren't actually going to be available at the time. That's not ready for use. So on the one hand, in his brief, he says, I think it's good that we used ready for use at the time of availability, at the time of compliance, immediately obtainable. And on the other hand, here and in their brief, they're saying, well, when we promulgated this rule, we didn't actually think that all of these substitutes would be available. One last question, which I forgot to ask. Of course, Your Honor. I'm standing. I wasn't necessarily persuaded as to cold storage warehouses. The member declaration says we run a chain of supermarkets. I think that gets you the other four factors. But my understanding is the cold storage warehouse is something that's not near the supermarket. It's off somewhere else. And I would think it's run by the distributor that sells goods to the supermarket, not by the supermarket. We have members, Your Honor, that do run cold storage warehouses. To your point, the declaration did not. The American Frozen Food Institute is an association that includes a lot of members that run cold storage. HEB run cold storage warehouses. I know it's not in the record. I don't have the answer to that. Sorry, Your Honor. But I'm happy to address that if it is something of concern to you. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Katsas